30 minutes per side is 16 dash 5165 Johnson versus Carpenter. Mr. Hurt, if you're ready. May it please the court. My name is Tom Hurt and I represent the appellant Raymond Johnson. With me is my co-counsel, Sarah Jernigan. A theme I want to return to several times hopefully in this argument. It relates to all the issues, particularly the first two. It flows from an instruction the trial court gave in this case, an instruction that correctly states the law in Oklahoma. It's instruction 13. Here's what it says. Even if you find the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of life for life without parole. So what you see in the Oklahoma scheme and structure is prosecutors and jurors looking at imposing death. There are many restrictions for them, very much guided discretion. But if you want to choose life, there's complete and utter freedom, total unfettered discretion to choose life under the Oklahoma framework. Two quick points here. One, of course, you know this is the case. This is not new, but it radically affects figuring out the harm of an error in a case. The second point I want to make is that it kind of drives prosecutors nuts. And I think it's about control and it's about fear. They fear that a juror may decide, well, for example, wow, I didn't really think that Raymond Johnson could do good, be a good preacher after these facts. But I watched that preaching video, and the way he gets down in the audience with the congregation, and the way he uses a prison parable suited for a prison audience in that structured environment that he thrives in, that he'll save souls, the juror may be evangelical, which is about evangelism. This guy can do good. I'm going to vote for life without parole. And that was the theme of the litigation case, right? Basically, basically. But various witnesses tried to reinforce that he did well in the structured environment of prison and that he was an effective, you know, Christian spokesman. Right. And you can understand the cognitive dissonance of a juror trying to think that that could possibly be true after the facts of this case. And then switching over to Proposition 2, you know, this fear that prosecutors have that makes them want to exploit that moral culpability instruction. And it's going to keep happening until relief is granted. Over and over again, it was happening in state court. And in the Lee case in 2002, this came up, the Tenth Circuit case. And then in Harris, Judge Chappell, I believe, noted the L.E. Lee case and said it was an egregious error to do what these prosecutors are doing. But, you know, here we do, you know, we're stuck with our legal framework here, right? And we defer to the OCCA unless no reasonable panel would. You know, where did the, you know, where did the state courts, in your opinion, go off the rails in this case? Well, it's hard to read very much from the opinion. It was OCCA's opinion on, for example, on the moral, we call it the moral culpability boundary argument is what we call it in our office. We see it so much. It keeps happening. It's going to keep happening. But OCCA just basically said deny. They described it in three words, I believe, and just said no prejudice. So that's why, you know, I'm looking at this prejudice prong and looking at this ability, a legitimate ability under Oklahoma law that's not in every state. Some states, you weigh the aggravators and mitigators, and if the aggravators outweigh, then you impose death. But in Oklahoma, one individual Bible Belt juror can look at this preaching, for example, and say, I want to choose life. So the prosecutors want to exploit that. They exploit this moral culpability instruction. And the way they did it in this case was particularly bad, and I know all of you have, I'm not sure if Judge Lucero has, but I know Judge Simcovich and Judge Matheson have seen this exploitation, this argument before. These prosecutors are doing it. They're going to keep on doing it. There's an argument tomorrow in this court, same problem. So what happened in this case that makes it different from the cases you have seen, such as Underwood and Grant and Hanson, there's two key things, but really looking, and Judge Matheson, I believe, really did a great job of dissecting the Grant opinion, and he went through the five factors, I believe, that were talked about in Hanson. But there's one exchange between the three principal actors before the jury in this case. It was an exchange between the prosecutor, the defense counsel, and the trial judge that really makes this case different. And I'm going to try to dissect that exchange a little bit. So the prosecutor says, after kind of setting the stage, grooming the jury for this moral culpability, you are, you know, the inquiry is moral culpability. It's kind of a drumbeat that started in Vaughn Dyer. So then finally at one point he says, but the judge tells you the inquiry is about moral culpability. And that finally gets Greg Graves, the defense counsel, you know, out of his seat. Your Honor, I'm going to object to this repeated statement that the inquiry is limited. Note the word limited to moral culpability. The judge says overruled, argument is for persuasion, purposes, you may continue. So the prosecutor doubled down from there. He doesn't say, no, I'm not trying to limit it. He says, the instruction says this, your consideration must be limited to moral inquiry as to culpability of the defendant. That's what the law says. The prosecutor is telling the jury what the law says. The second actor defense counsel, Greg Graves, says, Your Honor, I'm going to object. That is not an accurate statement of what the law says. The trial judge, the king of the, the master of the courtroom, the one who knows the most, kind of the know-all deal. You've got the jurors who don't know anything about the law. You've got the trial attorneys saying this is the law, that is the law. The trial judge says, note your objection, overruled. This is the exchange you've laid out in your brief, right, on page 42? I believe so, yes, yes. So the two big points from that exchange, one is, I believe it was factor five in your breakdown of the Grant case in Underwood. Let's see if I can find it here, yeah. The fifth factor that was deemed important in these other cases was that the prosecutor did not, you know, at no point did the prosecutor say the jury was not free under the law to consider all the mitigating circumstances. So this is a much worse case in those cases. The other thing is the endorsement by the trial judge in front of the jury. That's the huge thing, and it really, if you think about the jurors back in the jury room trying to make heads or tails of that moral culpability instruction, it's ambiguous, it's exploitable. But they can remember back to that exchange. You've got the prosecutor saying one thing, you've got the defense counsel saying another thing. You've got the trial judge, the master of the law, telling you what the law is, siding with the prosecutor. Well, this is like the case we just heard where the jury was correctly instructed, you know, subsequent to these exchanges, and, I mean, I guess it's arguable in this case that the prosecutor correctly recited the standard at one point. You know, why aren't those curative? And then the jury was given a list of the mitigating circumstances here, right? So, you know, whatever confusion there might have been from the argument, well, it was really spelled out for them. I believe what their role was. And this is another distinction between those other cases. In this case, we bring up the point that on those list of mitigating circumstances, that really doesn't help the jury at all, because the judge says in two different places in those instructions. Now, I'm not saying there's any aggravators or mitigators at all. So these unsophisticated, non-legal lawyers that aren't in their isolation booths parsing things out, they hear what they — well, I think, you know, I doubt they thought, well, I wonder if there was a burden of production on this. I wonder if there's some sort of threshold. No, they just thought, well, it sounds like the State and the defense got to present whatever they wanted. And we've had this argument in the courtroom about what the law is, and the trial judge sided with the prosecution. So you've got other reassurances. And I believe that with these other cases, they look for reassurances. I can go one by one through them, but the OCCA found a lack of prejudice. Right. Right. And what, you know, what they — and I understand there's double deference, or at least — I don't know if that applies to the prejudice, but let's say double deference. Let's look about — you know, we want to talk about something that's double. What we had in that exchange was a double imprimatur. I worked hard trying to learn how to pronounce that. The imprimatur of the government. You had the prosecutors doing it, and then you had the trial judge doing it. It was like a super imprimatur, or imprimatur squared, where the trial judge — you know, as far as the part of the analysis where you're trying to decide did this, you know, affect the jury, did the jury come to believe, or, you know, is there a reasonable probability that the jury or one juror or several jurors might have believed the prosecutor, who seemed to — who seemed to believe that he was saying, you know, what the law is, you know, even after Harris. Very easily conceived that that would have affected them. And we have to — you know, keeping on this mitigation boundary argument, there was this whole — I don't want to say grooming or conditioning the jury, where early on in Vaudire, sometimes they say it the old way, sometimes they say it the new way, but they kept saying with this drumbeat, you know, and I said, while considering the defense witnesses, the mitigation witnesses, while doing so, remember, the judge tells you moral and culpability is the inquiry. When you're considering it, I submit to you the question is, the judge tells you the inquiry. It's kind of conditioning for that statement. So I think the — more than a reasonable probability that the jury — the jury very much, several, one or two, however many jurors believed that that was the case, especially, you know, like my imagination where I see the juries sitting in the jury room trying to figure out this kind of mushy instruction. Well, remember what the judge said. Remember that argument? They were arguing about what the law was. So what did this do? Well, it obliterated the entire second stage, which, by the way, the defense had to fit in on a Friday on the last day of the two-week period allotted. You know, every case, every death penalty case is different. And I'd like to — Raymond Johnson is unique. He's — he has a different life story than — Counsel, you've got three propositions, and I think you've spent most of your time on number two, the Lockett-Eddings issue. Are we moving to — where are we now in your argument? Well, if — let me — let me — let me go — I've got a question about the other two. Okay. I won't — I won't interrupt you. Let's go to what I call the skipper — the skipper argument, which, if you look at the videotape issue, this videotape should not have been excluded. I — you know, there's cliches out there, but the cliches are often true. The thing is — This is the sermon? Yeah, the videotape of the sermon. Okay. So let me ask you just to — I'd like to get a better understanding of exactly how you're framing the issue, because it's stated as an ineffective assistance of trial counsel and appellate counsel. Right. And we have the witness part of it, which is the reduced list. Right. And then we have the non-witness evidence. So we've got the sermon, and we've got the hymn, and we've got the family picture. Right. Okay. So here's my question. Okay. I'm — I don't think I'm understanding as to the non-witness evidence, and that would include the sermon that you're about to get into. Right. Why is that evidence relevant to an ineffective assistance claim against the trial lawyer? In other words, it was the judge who excluded. Right. Right. But that's purely appellate. Appellate, I see. Okay. Now, that's helpful. So that's appellate. But then what's the ineffective assistance against the trial lawyer relative to the witness, the witness list, or the diminished witness list? It is confusing. I need to have a little better understanding of why was — because the government — I mean, the cumulative evidence objection by the government ultimately was overruled. So was it the trial counsel just wasn't aggressive enough in presenting more witnesses? What's the deficient performance there? If you look at the ABA standards, which, you know, several Wiggins other cases have said are service guides, there's a part in there, and I'm sure I know I cited it. It's that you can't — you know, being pressured by a judge or worrying about alienating a judge is not an excuse in a death penalty case. And if you look at the opening — I believe it's the opening argument in second stage by the trial attorney, he says, Now, you're going to get to see the whole Raymond Johnson now. A person is the sum of all their experiences, and then — and this applies to both Proposition 1 and Proposition 3, because some of it was — he was pressured into abandoning the mom, the stepfather. You know, jurors want to hear from people like that. That's — but he gave it all up under pressure. And on Proposition 3, there's — it's more of what he didn't even attempt to do, to tell that life story. He told them in — you know, I think he — you know, this idea that I'm going to tell you about the whole Raymond Johnson, a person is the sum of their experiences, he didn't do that at all. It should have. Part of it was getting pressured by the prosecutor, you know, filed the motion and the trial judge. What is it about his early childhood that you wanted counsel to do? Well, one thing — Or that he could have done. One thing that jumps out at me when I'm looking back over the state court action was this — you know, he had this preacher father, and unbeknownst to him, his real biological father was this, you know, multiple repeat felon who had forward psychotic features and, you know, didn't bring that up. But also this idea — he didn't know. It was not known to him. Correct. Right. Until adolescent, apparently. Late in life. And so the psychotic features and this identity of being the preacher's son and then learning it was a total lie that your preacher dad and mom were lying to you. You know, your whole sense of identity. Now, that was raised in the mother's affidavit, something she could have talked about in the post-conviction. Counsel pursued a strategy I guess I'd call the good Raymond strategy. Why is that? You know, 20, 20 hindsight. Right, right. I didn't work, you know, so we know that. But, I mean, you have to make a choice. Well, but do you have — the whole Raymond has its problems, too, doesn't it? But the — trying to at least give him some explanatory life history is not — does not — it compliments, it doesn't hurt at all the positive prisoner argument. At least — I can't see that it does. At least trying to give some explanation. Another part of that post-conviction was the fact that he was in the homeless shelter and was suicidal and trying to give some context of what happened. And that jury was given no context at all. Surely they would have wanted to know, you know, what's going on here? We need to know a little more. And, yes, strategic decisions are, you know, much — you know, trying to challenge a strategic decision, you know, the standard is so high. But it's — it doesn't look like it was a strategic decision based on what — you know, he had this opening argument where he laid out, we're going to tell you about the whole — you know, and he listed all these witnesses that he was going to do. And then it all went away. So it doesn't even appear strategic. Now, on the — back on the skipper claim, the video, you know, to me the video is by far the strongest of the — you know, the purely appellate IAC because the trial counsel tried to get it in. When exactly was the video made? Wasn't this, you know — It was made while he was in prison before. I believe it was at the Lexington assessment, which is kind of a beginning type, I believe. How many years before the — I don't know that. — what happened in this case? I don't — I'm not — I don't have that fact right at my fingertips. But it wasn't — it wasn't too long before — you know, he wasn't — he wasn't out very long. He wasn't — so I think it was, you know — and he was a young man. He was in prison. So it wasn't — it wasn't very, you know, that far back. And it — you know, it speaks to this — you know, he was in prison before. He does great. He does good. This structured environment gives him the ability to not get led away, not succumb to temptation like the — like in the affidavits in the post-conviction. Bishop Johnson, the preacher's stepfather, talked about, you know, I could have helped him. I could have helped him from leading astray. Well, prison keeps him from going astray. His unique talents — That was the argument that was made, wasn't it? It was, but — As I interpreted it. But not very well. And — It wasn't very well, but it was — they were confronting the continuing threat, aggravator, right? Speaking of that, if you look at the closing argument, the second-stage closing argument by defense counsel, you know, barely over a page long, it doesn't talk about anything, doesn't go through, doesn't try to rehabilitate and explain how the prosecutor and the judge were wrong on here's what the law is. Is the value of the videotape that it's — it's a more powerful piece of evidence than — Right. It's kind of like the Skipper — what happened in Skipper, where they were trying to say that he does well and he did well in jail. Well, these people over here, this shows it better because they're neutral or independent. Well, the videotape doesn't lie. You think his persuasiveness is undercut by the fact that he was a jailhouse preacher and then committed these crimes? Right. I mean, the only — like, you can see it might be a two-edged sword, as we say. Right. You know, and that's something the respondent talks about in the — in fact, the trial prosecutor said, oh, he's not sincere. He's just mimicking what his dad did. Well, the video could have shown that. You know, this idea — and that's where this idea about, you know, in a structured environment, he can do it. You probably don't believe it, you know, after what you've heard in that first stage. The video would have shown it to these Oklahoma jurors that he can do it, he does do it. In that structured environment, he can do good. He can be a positive presence, an evangelical presence. I've got a little under six minutes. Unless you have questions, I'd like to save it for later. Well, I told you, I had a question about your third proposition. Okay. Which is the development of mitigation evidence. Right. So this goes back to the first state post-conviction proceeding. Right. And could you help us understand a little bit better what evidence was presented there that was not in trial counsel's possession or was not in trial counsel's possession? Right. I actually — I made a chart of that, if I can find it. And most of it — Is the chart in the brief? No, unfortunately. Okay. And that ties into what, you know, Judge Timkovich was talking about, strategic decisions.  But didn't the OCCA say that — address this question of what was not there and what was there? Right. Most of it was in — Most of it was there. Right. If you look at, you know, the material about his biological father, they got that from the trial counsel. The DOC records that showed his good record, you know, that was in the trial counsel. So most of — you know. But then he had these affidavits from the mother and the stepfather that relay very poignant and important evidence. Well, but weren't they — I mean, the trial counsel listed both of them on his witness list for the trial and summarized what they — Right. The argument is that he didn't know that they were out there and didn't know what they were going to say. Why isn't that contradicted by the fact that there was information about them on the witness list to begin with? Well, I think that speaks to him violating the ABA and not being pressured and worrying about alienating the judge. Right. Also — But you've got these two claims. I mean, you've got him — it seems like you're arguing, well, he had witnesses and information that he had and he didn't use and he should have used. That's one. And the other is he failed to develop mitigation issues, evidence on the other. And it's this other one that I was interested in. Right. And it's — you know, it's — would love for that to have been played out in evidence you're hearing. But the mother, I think, is really important. You know, she didn't — he — you have to develop relationships. And that's in the ABA standards, too. You have to develop these relationships with the family members. He had not even made it clear to her how important it was for her to testify. And then after listing her, you know, apparently wanting to use her, backing off under pressure. If I use the rest of my time for rebuttal, unless there's — You may. May it please the Court, Jennifer Crabb, on behalf of the warden. I would like to start with Proposition 2, which is the mitigating evidence argument proposition.  Donald Grant, the only way in which this case is materially distinguishable from the Donald Grant case, is that in that case, the jury was given the old jury instruction, which included only the moral culpability or blame language. In this case, the jurors were instructed that mitigating circumstances were, one, moral culpability or blame, or, two, circumstances which in fairness, sympathy, or mercy may lead you as jurors, individually or collectively, to decide against imposing the death penalty. In Grant, the same types of arguments were made. The prosecutor there said that the law required that the evidence reduce moral culpability or blame, excuse me, said, quote, in order to be mitigating, and also, quote, before something can be mitigating, that it must reduce moral culpability or blame. And so the arguments were the same. There was an objection in Donald Grant that was overruled, just as there was here. All of the relevant jury instructions were the same, except for the fact that this Court found in Donald Grant that the instructions, I believe this Court said that there was a plausible argument that the prosecutor's statements were improper, but then said that the instruction cured that. And there was less of an instruction in that case than there is here, where the jury was explicitly told by the trial court and also by the prosecutor that they could consider anything as mitigating. Would you concede, though, that the prosecutor misstated the law here? I don't, Your Honor, because you have to view his comments as a whole. And he never, never once said you cannot consider mitigating evidence, never, not once. The district court made that finding. But the statement that your consideration must be limited to a moral inquiry is. That's not correct. Right. But that was not directed at whether you can or cannot consider mitigating evidence. When you look at what he was arguing as a whole, he was saying, when you get down to deciding whether or not Raymond Johnson deserves the death penalty, consider his moral culpability or blame. I'm sorry. I'm having trouble with that word today. So, no. Well, the fact that he didn't go on and say you can't consider anything else, is that really something that makes it proper to limit the statement to moral culpability? Yes. Yeah. The test is, well, the ultimate test is whether there was a reasonable likelihood in light of the entire trial that the jury misunderstood. But, yes, the prosecutor acts improperly if he tells the jury that they cannot consider mitigating evidence. Well, let's back up. I mean, you're relying on Grant and saying, Grant, if I'm understanding your argument, Grant's controlling here. But even in Grant, the Court said that it's a plausible argument that these were improper comments. And as counsel mentioned, this seems to keep happening. I mean, it's why does this keep happening? Because what the prosecutors are doing This is, this has echoes of the repetitive problems we were getting on the victim impact statements from the, in these cases. And it just seems like this is kind of repeating itself. I mean, we now have, we now have developed case law. We have the new instruction. Are we going to keep seeing prosecutors just say consider the moral culpability and then have you come in and say, oh, but they didn't say you couldn't consider anything else? But it is not improper, Your Honor, to consider moral culpability of blame. In fact, that's the answer. I didn't say it was. It's part of the larger picture. But if that's the only thing the prosecutor says, and it was in certain circumstances here. I understand you're reading it as a whole. But if you take, if you take some of these statements, that's all the prosecutor  Yes. Yes, there were, there were a couple of times. I don't think that that is improper to do that. I will say that, as in Grant, there's a plausible argument that it's improper. And yet, even the Supreme Court has recognized that when an advocate is standing before a judge. Well, now, I understand your argument. I just wonder if the message, if the message is getting back. The Oklahoma Attorney General could do some training of your State prosecutors and emphasize his points. Yes, Your Honor. We could certainly consider that. I find this case to be distinguishable from Grant in his arguments. And I, it's difficult because the closing arguments are lengthy for me to go through and point it out point by point. But I do not believe that the prosecutor was directing the moral culpability or blame specifically at the mitigating circumstances. But at the jury's overall sentencing decision, that third step, after they find an aggravators, outweigh the mitigating circumstances, and then at that third step where they have unfettered discretion to decide what sentence to impose, that's what the prosecutor's comments, and I believe, again, reading it as a whole, that's what he was directing it to. So there was no attempt here to limit the jury's consideration of mitigating evidence. But moving beyond that, even if this Court finds that I'm incorrect. Yes. We aren't suggesting an issue of intent. It's just what the words were. I mean, the jury is going to hear the words, irrespective of what the intent of the prosecutor was. And if the words are too limiting, they're too limiting. Sure. I'm sorry. I believe I said attempt, not intent. And what I meant by that was, yes. I'm sorry. I thought I must have not heard you correctly, so I apologize. No, that's okay. But I will still address that. I don't believe that the words themselves, even, were directed towards whether the jury could or could not consider the mitigating circumstances in this case. But if this Court disagrees with me, in Brown v. Payton, the prosecutor no doubt told the jury that they could not consider the mitigating evidence under California's instruction, Factor K. And the Supreme Court nevertheless denied relief because of the arguments of defense prosecutor as a whole and the jury instructions. And in Donald Grant, this Court pointed out that it would be hard-pressed to grant relief where the Supreme Court has never done so in a case such as this. And so for all of those reasons, setting aside the propriety or impropriety of a couple of the prosecutor's individual comments here, there is no reasonable likelihood that the jury would have believed that they were not free to consider all the mitigating circumstances in this case. And one final point I would make on this proposition is that it is an ineffective assistance of appellate counsel claim, not a prosecutorial misconduct claim. And so we then must also look at the Court of Criminal Appeals case law to determine prejudice and whether there's a reasonable probability that the Court of Criminal Appeals would have granted relief on direct appeal if counsel had raised this issue. And the Court of Criminal Appeals had repeatedly, before this case, denied relief in similar cases. I cited Hogan and Short in my brief and also in Harris where the prosecutor did make some comments limiting mitigation. The Court of Criminal Appeals had found that to be cured by the, what we call the pre-Harris instruction. And so for all of those reasons, the Court of Criminal Appeals ---- At the end of the day, aren't we reviewing the, under AEDPA, the OCCA's determination of no prejudice? Correct. Yes. And in light of the Court of Criminal Appeals' precedents as well as the Supreme Court's precedents, there was ---- they reasonably determined there was no prejudice. If the Court doesn't have any further questions on that proposition, I will turn to Proposition 1 and specifically beginning with the ineffective assistance of trial counsel claim for not presenting all of the witnesses. How do we know that was a strategic decision? We must ---- Why would we conclude that? We must presume that it was, Your Honor, under Strickland and Burt v. Titlow. But further, this theory that the trial court was rushing defense counsel was not presented to the Court of Criminal Appeals. Most of the evidence that Petitioner relies on for that was developed after this proposition was raised in the Court of Criminal Appeals. On ---- there were two motion hearings before trial in ---- one on October 22nd of 2007 and one on February 25th of 2009, which was about four months before trial, where they were discussing scheduling. And the trial court looked at our calendar and she said, we could do the trial on this date. Then we would have two weeks. And the second week would be a non-jury trial week. And everybody said, okay, no problem. And then subsequently in 2009, when the defense was contemplating the continuance, the judge did the same thing, looked at our calendar, said, okay, if we did the trial on this date, we would have two weeks. Nobody ever said two weeks isn't going to be enough. And it wasn't. And the trial court never said, and only two weeks, and if we have to finish it by that Friday, we cannot go over into the next week. And then in the trial transcripts, and Petitioner points to nothing in the record where anybody said, guys, we've got to get this done. Come on, trial counsel, don't present so many witnesses. We need to get this done. The idea of the half-hour lunch break, that was after the defense had rested. So the defense had already rested its case. And so it's reasonable to assume that the trial court did that so that the jury would have as much time as possible once the case got to them. So there is absolutely no evidence in the record that trial counsel was rushed by the trial court. Did you just say a minute or two ago that the trial counsel being rushed argument was not presented to the OCCA? Yes, Your Honor. So are we talking about an unexhausted claim? We are talking about an unexhausted part of the claim, yes, Your Honor. Okay. And if that's... And you've argued that in your brief? I have, yes. Okay. The argument in the Court of Criminal Appeals was that counsel was forced by the prosecutor's objections and the trial court's rulings, but not by this artificial time constraint. We know, too, that approximately two months before trial at a motion hearing, the defense asked the State for a... for them to provide a more... a shortened witness list. And then said, and we'll probably cut ours down, too. That was two months before the prosecutor's cumulative objection was filed. And so that's, Chief Judge Temkevich, evidence that it was strategic, that before the prosecutor had objected, the defense was already thinking about cutting their witness list. And as I pointed out in my brief, almost all of the witnesses who were not called were cumulative. There was one, another inmate, another, excuse me, another minister who was going to talk about petitioner's prison ministry that was excluded. And then there was... there was a childhood friend, Terrence Cook. All we know about him from the witness list is that he was going to talk about petitioner's childhood and his criminal background. We do know from the second post-conviction, which this Court can't consider under AEDPA, but should you find AEDPA satisfied, Mr. Cook was going to... would have testified that petitioner was in a gang, was involved in a shooting incident, and then he was going to testify about an incident in prison where petitioner was angry at a fellow inmate, and Mr. Cook said that it was like something clicked and he just lost it, and petitioner just lost it. So there was very good reason not to introduce the testimony of Terrence Cook. Moving on to the exclusion of evidence in Skipper, the defense had presented his testimony and that of his wife as to his good behavior in prison, and then the trial court did not permit him to present the objective testimony of prison officials. And so the Supreme Court held that the jury would have naturally given much greater weight to these third parties than to the petitioner and his wife. Another factor that they found very significant in Skipper was the fact that the prosecutor specifically argued that petitioner would be dangerous in prison. In Donald Grant, as I pointed out in my brief, this Court reviewed under the very lenient COA standard, a claim where the defendant presented the testimony of an expert witness who had relied on other expert witnesses as well, or other experts, excuse me. The trial court excluded that witness's exhibits, the exhibits prepared by the testifying expert, Dr. Grundy, and also excluded the reports of the non-testifying experts. And this Court held that there was no error because petitioner was able to present most of the evidence. So here we have this video of petitioner preaching. The jury was well aware that petitioner preached when he was in prison. The prosecutor did not refute that, did not argue that he wasn't good at it, argued only that his heart wasn't in it, that he was mimicking what he had grown up watching. And nothing about having seen that video would have altered that argument. Why wouldn't it? I mean, isn't that why the defense wanted to present the video, to show that it was genuine and that he was in his element and this is why he did well in prison? So why wouldn't that directly rebut the notion that his heart wasn't in it? Because the prosecutor was saying that he was mimicking. So while he may appear to be. Why isn't that something for the jury to decide? Oh, it is. By seeing the sermon, by listening to the sermon. Why wasn't it error to keep it out? It would have been better to put it in. I argue under Lockett v. Ohio, not this Court's Lockett, that the jury would not have naturally given it much greater weight, and same thing under Donald Grant, that it was not error. But it is a closer question than with the CD of the song or with the photographs. Did the prosecution object to the introduction of the video? Yes. Or was it purely a trial court decision? The prosecutor objected. What was the nature of the objection? What was the basis of the objection? That it was not relevant and that it was hearsay. So today you do say it was relevant? That's a really hard question, Your Honor. The hearsay, I do not stand on that. The Supreme Court has defined mitigating evidence as characteristics of the defendant or his record or circumstances of the defense. And has defined it broadly. I just don't know if it goes to characteristics of the defendant, but that's a close call. And so if this Court were to conclude that it was error to exclude it, this Court has found in a number of cases that it's not prejudicial. Of course, here we also have deference to the OCCA, but in Bryson v. Ward. It's not that you're not relying on the hearsay objection. I am not relying on the hearsay objection, Your Honor. The trial court gives its basis for ruling in favor of the prosecutor. Both that it was not relevant. She said that it's more to her way of thinking. It was more of a profession and not a talent. That the singing was a talent. The preaching was not a talent in her view. And then also hearsay. And she also said, and this has never been cleared up, she said, I don't know how you're going to authenticate this, how you're going to sponsor it. And that's never been revealed. So it's not even entirely clear that Petitioner could have gotten it in, because we don't know what witness would have sponsored this video. But in Bryson v. Ward, the trial court excluded the Petitioner's videotaped confession. So here we have the same sort of evidence, a videotape, something that the jury could see with their own eyes, which Petitioner said would show his remorse and his state of mind and his demeanor. In this Court said that it was too. I'm a little confused about this whole relevance notion. If the theory of mitigation is that he could function well in a prison environment, how could showing that he gave sermons in prison not be relevant to that argument? I really am having a hard time. Are you using relevance in the sort of rule 401 sense that no, absolutely no help at all? Or is it more of a relevance in a 403 sense that maybe it was cumulative of all these witnesses who were allowed to testify about him giving sermons? I mean, if it's not relevant, why were they allowed to testify? No, I agree that the evidence that he preached while in prison is relevant. What I am unsure about is whether a video of him preaching to show how good he was at it is relevant. Well, is that the only reason it was offered? I believe so, Your Honor. I mean, the counsel didn't make it clear other than showing his unique gifts. So I do think that's the best of my regard. I still don't understand why it's any different from calling a witness to say that he gave sermons and he was effective at that. Yes. I agree. As I said, I think relevance is a really close question, although I still think – Well, relevance in what sense? I mean, is it because it was cumulative? Is that the argument? Or is it that it didn't have anything to do at all with mitigation? Is that the argument? No, it's neither, I guess I would say. It had something to do with it. Tenard v. Dretke, the Supreme Court, said that the gravity of the evidence has a place in determining relevance. And I think that's where I'm at. Was it not relevant at all? I'm kind of a rules person, and I'm just not seeing where the argument is here. But I think I sort of belabored the point, so you can – Okay, yes. Moving on, assuming that it was error to exclude the evidence, in Lockett v. Trammell, there was an expert witness who testified, and the trial court made her testify only in generalities. She was not allowed to testify that, in her opinion, the petitioner's childhood caused him to become the person that he became. And because of the limits on her testimony, there was evidence that the jury did not receive, such as that the petitioner's mother used drugs while pregnant and that his father threatened him once with a gun. So we have her opinion testimony was not allowed, and then there were actual pieces of mitigating evidence that did not get in. And this Court found that to be harmless. In this case, the OCCA found a lack of prejudice, right? Correct. From the exclusion of, I guess, all of these pieces of evidence. That's correct. Yes, Your Honor. And that was eminently reasonable because it was cumulative. And also because, as this Court has recognized – The video was cumulative. The video was cumulative, yes. Yes. Yes, I'm sorry, Your Honor. That's fine. I think we know where we are at this point. Okay. Okay. You also have to consider what the prosecution would have done with this videotape. The prosecutor had emphasized in closing argument that, based on a statement in Petitioner's confession, where he said that Ms. Whitaker said she was dying and the petitioner said, you deserve to die, you deserve to die. And so the prosecutor used that to say, Petitioner, he's all about himself, and he decided that it was time for Brooke Whitaker to die, and so he killed her. Well, Petitioner says in the sermon that you're sitting and you're watching TV and you see a cockroach, so what do you do? You get off your bunk, you get a house shoe, and you track it down and you kill it. And I know we're talking about a cockroach, but the prosecutor could very well have gotten up there and said that's exactly what Petitioner did with Brooke Whitaker. He decided that she was a nuisance in his life, and so he tracked her down. We know he went by her house when he knew she wasn't there and waited, lay in wait for her. He tracked her down, and he killed her. What does the video have to do with that? Was that evidence had not come in? About the cockroach, Your Honor? No. Your cockroach example, you're saying if the video had come in, the prosecution could have made that argument. Yes. But they could have made that argument, whether the video was introduced or not, because of the fact that other testimony had come in about his preaching in prison. Sure. But they could have, absolutely, they could have made the argument that he lay in wait for her. But the connection here is that we have Petitioner saying that he tracks something down and kills it. And so the prosecutor could have analogized that to Petitioner tracking Ms. Whitaker down and killing her. You also have the very stark contrast between Petitioner's preaching video where he shows passion and the confession video where he's talking about killing the woman that he referred to as his wife in the seven-month-old baby that he said he thought might be his child. And he's cold, and he's matter-of-fact, and he blames Brooke Whitaker over and over again. And, yes, all of this was before the jury, but I think any competent prosecutor would have said, please do, go back to the jury room, watch this tape of him preaching. And then I want you to put in next the tape of this confession, and I want you to watch it. And I want you to see if you believe that the passion that he showed on that video is genuine. Let me make sure I'm connecting this to the issue of ineffective assistance of appellate counsel. I take it what you're arguing is that appellate counsel's failure to raise these issues was strategic because it was possible that some of this evidence had come in. It would have been disadvantageous to the defendant. Is that what you're saying? No, Your Honor. I'm really referring to prejudice with this argument, whether Petitioner would have been prejudiced. This Court, when it reviews ineffective assistance claims, talks about looking at what the prosecutor would have done with the additional mitigating evidence. Yeah. But isn't it a bit speculative, though, to be thinking, well, the prosecutor might have been able to do this with this or might have been able to do that? It seems to me that goes more to the calculation that the appellate counsel would be making as to whether the issue should be raised on appeal in the first place. Sure. And that could absolutely. And there were nine propositions of error raised here. But when you move over to prejudice, then that puts the Court into kind of engaging in that, well, they might have been able to do this, they might have been able to do that. I'm not sure that's what is typically done in a Strickland prejudice analysis. It's just more a matter of, well, you know, was the deficient performance prejudicial? I believe in Little John, Your Honor, the second Little John, this Court specifically said we have to consider what the prosecutor might have done with the additional mitigating evidence. And so that's where that argument comes from. Can I ask you, because we're kind of on the countdown, on Proposition 3, and this is really the same question I asked Mr. Hurd, and that is this claim about failure to develop mitigating evidence and the question of at the first post-conviction, state post-conviction proceeding, what was presented at that point that the trial counsel didn't already have? Can you help us with that? Sure. There is only one thing that we don't know for sure whether counsel had it or not. Everything else we know counsel had. We know the parents were on the witness list. We know that he called James Reed to testify. We know Laura Hendricks was on the witness list. And we know that counsel had the prison records, both Petitioner's prison records and Petitioner's father's prison records. So we know that counsel had all of that. The only thing that it's possible that counsel did not do is actually speak with Petitioner's father. We don't know whether counsel did or did not do that. There's no evidence in the record as to that. And the third COA, did it, does it cover, I guess, the issues relating to the first post-conviction proceeding, but does it extend to the second? I believe that it does, Your Honor, extend to the second. However, the second, the arguments made in the second post-conviction are procedurally barred. And the evidence presented in the second post-conviction could not be. In fact, it's an, I argue that it's also an exhausted, it's such an entirely new, I'm sorry, that doesn't make sense, that the way Petitioner presented it in his opening brief, which was combining the two, is unexhausted because the first post-conviction theory was counsel should have presented additional evidence that he had a good childhood. The second one is a completely different claim. It's that he was physically abused, he was raped, he, his parents, although they acted like they were good Christians, his mother was a gambler and his father was a serial adulterer. So it is an entirely different claim. And are you saying, though, that Mr. Johnson's opening brief covered all of that? Did they, did it make the argument relating to the second post-conviction proceeding? Yes and no, Your Honor. At times it stated that it was limited to the issues in the first post-conviction and acknowledged that the evidence presented in the second post-conviction would be barred under Penholster. And yet, when you get towards the end of that proposition of error in the opening brief, counsel argued that the Court of Criminal Appeals unreasonably failed to find that the new evidence contradicted what was presented at trial. The new evidence at the second proceeding. He doesn't, counsel does not acknowledge that, but I think that's the only evidence that it could be. I'm in search of some preservation of that issue here, and I just, but you think it is preserved. As far as having been presented in the opening brief? Yes. It's a very difficult call, Your Honor. It's probably not adequately briefed it's hinted at, but it is certainly not the focus of that claim. In Proposition 1. If the Court does not have any other questions, I would ask you to please affirm. Thank you, counsel. Thank you. We have some rebuttal time for Mr. Hurd. May it please the Court. First, I want to agree with Judge Matheson about the parallels to the victim impact request for death cases. You know, we had, there were ten cases where this court found the prosecutors were violating the Constitution, and nothing ever came of it. And in Dodd, this court said, hey, these prosecutors know what they are doing. To say that it doesn't affect the jury is to say these experienced and highly successful prosecutors don't know what they are doing, and we, the judges of the Tenth Circuit, know better than these experienced, long-time Oklahoma prosecutors what works. Now, this almost feels like instead of an AG CLE, there's a DA CLE going on, and they're telling them this really works to limit the culpability, limit it to moral culpability. Because we see it over and over and over again. And really, on the victim impact issue, what the prosecutors were doing, the State was trying to do what it couldn't under the law, because there's restrictive, guided discretion. Here, in this instance, they're trying to negate what Johnson has every right to do, to have as a constitutional right to do, to present evidence that's not related to moral culpability, that he has a gift. He's unique. He has a gift of preaching. It was taught to him, and it works, and it helps people, and it's an extremely, totally legitimate reason to vote for life without parole. Now, I'd like to point out, too, that how the prosecutors and the trial judge in this case, who used to be, you know, shortly before, was in the DA's office. She said how effective a minister he is, I don't think, goes toward mitigation. So it's cognitive dissonance, I think, that the prosecutors have. It's like a blind spot or a denial. Now, speaking of cognitive dissonance, the jury needed that video to get over it. Under this case, in bad cases, there can be relief. We've seen it over and over again, and sometimes it seems like bad cases get relief more often, almost, because of what the prosecution does and what the defense does. I'm past time. Okay, counsel. Appreciate your arguments. Counselor, excuse the case will be submitted, and the court is in recess until tomorrow morning.